# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| STEVEN F. URVAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| AMMO, INC.; SPEEDLIGHT ) | |
| GROUP I, LLC; FRED W. ) | |
| WAGENHALS; CHRISTOPHER ) | |
| D. LARSON; JOHN P. FLYNN; ) | |
| JESSICA M. LOCKETT; ) | |
| RICHARD R. CHILDRESS; ) | |
| HARRY S. MARKLEY; ) | |
| RUSSELL WILLIAM ) | |
| WALLACE, JR.; ROBERT J. ) | Consol. C.A. No. 2023-0470 PRW |
| GOODMANSON; AND ) | |
| ROBERT D. WILEY, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| ) | |
| AMMO, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| STEVEN F. URVAN, ) | |
| ) | |
| Defendant. ) | |

Submitted: December 18, 2023
Decided: February 27, 2024

*Upon Defendants Ammo, Inc., Speedlight Group I, LLC, Fred W. Wagenhals, Christopher D. Larson, John P. Flynn, Jessica M. Lockett, Richard R. Childress, Harry S. Markley, Russel William Wallace, Jr., Robert J. Goodmanson, and Robert D. Wiley's Motion to Dismiss*
**DENIED, in part; GRANTED, in part.**

*Upon Defendant Steven F. Urvan's Motion to Dismiss*
**DENIED.**

## MEMORANDUM OPINION AND ORDER

Kevin M. Coen, Esquire, Rachel R. Tunney, Esquire, MORRIS, NICHOLS, ARSHT & TUNNEL LLP, Wilmington, Delaware, Nicholas Cutaia, Esquire, Jaclyn Grodin, Esquire, GOULSTON & STORRS PC, New York, New York, Joshua M. Looney, Esquire, Nora A. Saunders, Esquire, GOULSTON & STORRS PC, Boston, Massachusetts, *Attorneys for Plaintiff/Counterclaim Defendant Steven F. Urvan*.

A. Thompson Bayliss, Esquire, Peter C. Cirka, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware, *Attorneys for Defendant/Counterclaim Plaintiff AMMO, Inc. and Defendants Speedlight Group I, LLC, Fred W. Wagenhals, Christopher D. Larson, John P. Flynn, Jessica M. Lockett, Richard R. Childress, Harry S. Markley, Russell William Wallace, Jr., Robert J. Goodmanson, and Robert D. Wiley.*

**WALLACE, J.** [1]

---

[1] Sitting by designation of the Chief Justice pursuant to *In re Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. Feb. 23, 2023) (ORDER).

These consolidated cases emanate from a merger agreement executed in April 2021 by AMMO, Inc., SpeedLight Group I, LLC, Gemini Direct Investments, LLC, and Steven F. Urvan (the "Merger Agreement"). That agreement facilitated Mr. Urvan's sale of Gemini and its subsidiaries to AMMO. Under it, Gemini merged into SpeedLight, AMMO's wholly owned subsidiary. As part of the deal, Mr. Urvan became AMMO's largest shareholder, joined its board, and became its Chief Strategy Officer. Before long, the relationship soured.

Now, Mr. Urvan is suing AMMO, SpeedLight, and nine individual AMMO directors and officers (the "Individual Defendants" and, together with AMMO and SpeedLight, the "AMMO Entities"). All his claims stem from alleged misrepresentations in the Merger Agreement. AMMO, in turn, is suing Mr. Urvan. It claims misrepresentations as well as breaches of Mr. Urvan's indemnity obligations. Each side has moved to dismiss the other's complaint. But neither motion quite gets there.

Indeed, all but one of the volleyed counts satisfies the required reasonable conceivability threshold. The only deficient claim is Count II of Mr. Urvan's complaint. Through it, Mr. Urvan complains the Individual Defendants aided and abetted AMMO and SpeedLight's purported fraud. But it's well-established that officers and directors acting in their capacity as agents can't abet their corporate principal's torts. So, Mr. Urvan's Count II must be dismissed. Apart from that

minor exception, final resolution of these parties' competing claims will require a fulsome inquiry into the facts.

## I. FACTUAL & PROCEDURAL BACKGROUND[2]

### A. PARTIES AND RELEVANT ENTITIES

Plaintiff/Counterclaim Defendant Steven F. Urvan was the ultimate owner of GunBroker.com, a successful online retailer of firearms and related products.[3] GunBroker was directly owned by IA Tech, LLC, which was owned by Gemini Direct Investments, LLC.[4] Mr. Urvan owned Gemini and its subsidiaries.[5] Following the merger at issue here, Mr. Urvan became AMMO's largest shareholder and a member of its board.[6]

Defendant/Counterclaim Plaintiff AMMO is a publicly traded Delaware corporation headquartered in Arizona.[7] At the time of the merger, its business focused on the manufacture and sale of ammunition.[8]

Defendant Speedlight is a Delaware limited liability company headquartered

---

[2] These facts are drawn from the parties' respective complaints and are presumed to be true solely for purposes of this opinion.

[3] Urvan's Compl. ¶¶ 2, 27 (D.I. 1).

[4] *Id.* ¶¶ 2 n.2, 35.

[5] *Id.* ¶ 35 n.3.

[6] *Id.* ¶ 12.

[7] *Id.* ¶ 13.

[8] *Id.*

in Arizona.[9]  AMMO formed Speedlight in April 2021 for the purpose of consummating this merger and is Speedlight's sole member.[10]

Defendant Fred W. Wagenhals is a co-founder of AMMO.  At the relevant times, he was AMMO's chairman of the board and CEO.  He is a significant AMMO shareholder, and he actively participated in negotiating and executing this merger.[11]

Defendant Christopher D. Larson is another AMMO co-founder.  He had been the VP of Finance for AMMO and actively participated in the merger.  In 2020, the SEC barred Mr. Larson from holding an officer or director position in any public company for five years based on his fraudulent business conduct.[12]  Mr. Urvan alleges Mr. Larson was nonetheless a *de facto* officer and director of AMMO at the relevant times.[13]

Defendant John P. Flynn, a disbarred lawyer, was an AMMO VP who actively participated in the merger.[14] Mr. Flynn was disbarred in 2019.[15] Mr. Urvan alleges Mr. Flynn was nonetheless permitted to continue as *de facto* in-house counsel

---

[9]   Urvan's Compl. ¶ 14.

[10]  *Id.*

[11]  Urvan's Compl. ¶ 15.

[12]  *Id.* ¶ 5.

[13]  *Id.* ¶ 16.

[14]  *Id.* ¶ 17.

[15]  *Id.* ¶ 91.

-3-

to AMMO.[16]

Defendant Jessica M. Lockett is a corporate attorney who had been a member of AMMO's board and an AMMO shareholder. She served on AMMO's Audit Committee. She, too, participated in the merger negotiations and approval.[17]

Defendant Richard R. Childress is also an AMMO director and shareholder. He was on AMMO's Audit Committee and participated in the merger negotiation and approval.[18]

Defendant Harry S. Markley is another AMMO board member and shareholder that participated in the merger negotiations.[19]

Defendant Russell William Wallace, Jr. is, likewise, an AMMO board member and shareholder. He was on AMMO's Audit Committee and participated in the merger negotiations and approval.[20]

Defendant Robert J. Goodmanson was, at relevant times, AMMO's president, and a member of its board. He was an AMMO shareholder and was also employed at an investment advisory firm that held a stake in AMMO. He, too, participated in the merger negotiation and approval.[21]

---

[16] *Id.* ¶ 94.

[17] *Id.* ¶ 18.

[18] *Id.* ¶ 19.

[19] *Id.* ¶ 21.

[20] *Id.* ¶ 22.

[21] *Id.* ¶ 20.

Finally, Defendant Robert D. Wiley has been AMMO's Chief Financial Officer since 2019 and is an AMMO shareholder. He also participated in the merger negotiation, execution, and approval.[22]

## B. THE PRE-MERGER EVENTS

### 1. The Titon and Tenor Litigations

Triton Value Partners, LLC performed services for GunBroker from 2006 to 2013.[23] In 2017, it brought suit, alleging Mr. Urvan failed to pay it for services and engaged in fraud to hide assets from creditors like Triton (the "Triton Litigation").[24] The Merger Agreement specifically identified cases related to this dispute as the "Triton Matter."[25] Now, AMMO seeks indemnification for attorney's fees it has incurred from the Triton Litigation.[26]

Tenor Capital Partners, LLC, initiated litigation in federal court after Mr. Urvan, acting through GunBroker, allegedly failed to pay over $1 million in fees (the "Tenor Litigation").[27] The Merger Agreement included the Tenor Litigation as

---

[22] *Id.* ¶ 23.

[23] AMMO's Am. Compl. ¶ 15 (D.I. 60).

[24] *Id.* ¶¶ 16-17.

[25] AMMO Entities' Opening Brief in Support of their Motion to Dismiss (Hereinafter "AMMO's Mot."), Ex. 1 (hereinafter "MA") § 1.56 (D.I. No. 36).

[26] AMMO's Am. Compl. ¶¶ 81-84.

[27] *Id.* ¶¶ 18-20.

"Other Litigation."[28]  Following the merger, GunBroker lost at the trial level, and Tenor was awarded $1.5 million in damages.[29]  As part of its appeal, GunBroker, which by this time was owned by AMMO, had to post a $1.55 million appeal bond.[30] AMMO and Mr. Urvan have disputed who is responsible for paying the premium on the appeal bond.[31]  After AMMO filed this action, Mr. Urvan paid the $38,750 appeal bond premium, but the parties still dispute the associated fees.[32]

### 2. Ms. Hanrahan's Whistleblower Complaint

Prior to the merger, AMMO had legal problems of its own.  Specifically, in August 2019, Kathleen Hanrahan, a former AMMO executive and board member, filed a whistleblower complaint with OSHA "alleging numerous financial, accounting, and reporting violations at AMMO, including violations of SEC rules and regulations."[33]  She also claimed retaliation.[34]  In February 2021, OSHA determined there was reasonable cause to believe AMMO had violated the Sarbanes-Oxley Act.[35]

---

[28]  MA § 1.38.

[29]  AMMO's Am. Compl. ¶ 46.

[30]  *Id.* ¶ 47.

[31]  *Id.* ¶¶ 48-54.

[32]  *See* AMMO's Brief Opposing Urvan's Motion to Dismiss (hereinafter "AMMO's Opp'n Br.") at 47 (D.I. No. 76).

[33]  Urvan's Compl. ¶ 8.

[34]  *Id.* ¶ 67.

[35]  *Id.* ¶ 68.

AMMO's board formed a special committee to investigate Ms. Hanrahan's allegations.[36] In contrast with OSHA's findings both initially and on appeal, the special committee found Ms. Hanrahan's claims were unsubstantiated.[37] Eventually—about ten months after the merger closed— Ms. Hanrahan filed a federal lawsuit against AMMO based upon her whistleblower complaint.[38] AMMO settled with Ms. Hanrahan a few months later.[39]

### 3. Mr. Urvan's Efforts to Sell GunBroker

With a $50 million payment under a financing agreement due on May 1, 2021, Mr. Urvan began looking for a buyer for GunBroker in 2020.[40] He first retained Houlihan Lokey ("HL") as Gemini's advisor in that effort. The agreement between Gemini and HL contained a tail provision that permitted HL to recover a fee if a "qualifying sale" occurred within a set time after the engagement ended.[41] The tail provision was only triggered if, within one year after the HL agreement ended, GunBroker was sold to a "Contact Party."[42] A "Contact Party" is defined as an

---

[36] Urvan's Compl. ¶ 69.

[37] *Id.*

[38] Urvan's Compl. ¶ 70.

[39] *Id.* ¶ 70.

[40] AMMO's Am. Compl. ¶ 21.

[41] *Id.*

[42] Urvan's Opening Brief in Support of his Motion to Dismiss AMMO's Amended Complaint (hereinafter "Urvan's Mot."), Ex 1 § 2 (D.I. 72).

entity:

> (i) Houlihan Lokey identified, contacted or with whom Houlihan Lokey or the Company had substantive discussions regarding a potential Transaction during the term of this Agreement, or (ii) reviewed the information memorandum or any other written materials prepared by Houlihan Lokey or by the Company with the assistance of Houlihan Lokey concerning GunBroker and/or any proposed Transaction[.][43]

AMMO does not allege in its Amended Complaint that it was a "Contact Party" or that HL has ever sought a fee from Mr. Urvan or any related entity.

Mr. Urvan also worked with Matthew Hayden to find a buyer.[44] Mr. Hayden introduced Mr. Urvan to "more than twenty" potential buyers for GunBroker and provided him advice about the sale.[45] In December 2020, Mr. Hayden introduced Mr. Urvan to Maxim Group. LLC, which eventually led to the merger.[46] Unlike HL, Mr. Hayden has sought payment from Mr. Urvan.[47] When Mr. Urvan didn't pay, Mr. Hayden sued him in Florida federal court.[48]

---

[43] Urvan's Mot., Ex. 1 § 2.

[44] AMMO's Am. Compl. ¶ 23.

[45] *Id.*

[46] AMMO's Am. Compl. ¶ 24.

[47] *Id.* ¶ 30.

[48] *Id.*

### 4. The Verska Agreement

Stephen Verska was a key Gemini employee.[49]  On April 30, 2021, the day the merger closed, Mr. Urvan and Gemini signed a separate agreement with Mr. Verska and Mr. Verska's company, SharkDiver Consulting, Inc. (the "Verska Agreement").[50] The Verska Agreement, which purports to be a severance agreement releasing any claims Mr. Verska or SharkDiver might have against Mr. Urvan or Gemini, promised to pay Mr. Verska $1 million per year for three years.[51]  Before that, Mr. Verska's annual salary had been $250,000 plus bonuses.[52]

Mr. Urvan had negotiated for Mr. Verska's continued employment at GunBroker during the merger discussions.[53]  Accordingly, after the merger, Mr. Verska stayed on as GunBroker's Chief Technology Officer.[54]  AMMO alleges that the undisclosed Mr. Verska Agreement was truly designed to secure Mr. Verska's loyalty to Mr. Urvan.[55]  AMMO claims that Mr. Urvan desired to use Mr. Verska to retain control over GunBroker after it was sold to AMMO.[56]  It

---

[49]  AMMO's Am. Compl. ¶ 4.

[50]  *Id.* ¶ 59.

[51]  *Id.*

[52]  AMMO's Am. Compl. ¶ 56.

[53]  *Id.* ¶ 57.

[54]  *Id.* ¶ 58.

[55]  *Id.*

[56]  AMMO's Am. Compl. ¶¶ 58, 64.

buttresses that accusation by pointing to Mr. Verska's post-merger insubordination in favor of "Urvan era" GunBroker employees and Mr. Urvan's discontinued payments under the Verska Agreement once AMMO fired Mr. Verska.[57] Mr. Verska has since sued Mr. Urvan and Gemini in Georgia federal court to recover $2 million purportedly still owed under the Verska Agreement.[58]

## C. THE MERGER AGREEMENT

In January 2021, Mr. Urvan learned that AMMO was open to buying GunBroker.[59] Thereafter, Mr. Urvan met with some of AMMO's key employees, and negotiations ensued.[60] During the negotiations, Mr. Urvan primarily engaged with Messrs. Larson, Wagenhals, and Flynn.[61] On April 19, 2021, in preparation for the impending deal, AMMO formed Delaware limited liability company SpeedLight as its wholly owned subsidiary.[62]

Then, on April 30, 2021, the Merger Agreement was executed.[63] Pursuantly, Gemini merged with SpeedLight, and SpeedLight survived.[64] In exchange,

---

[57] *Id.* ¶¶ 64-70.

[58] *Id.* ¶ 71.

[59] Urvan's Compl. ¶ 28.

[60] *Id.* ¶¶ 29-41.

[61] *Id.* ¶ 33.

[62] *Id.* ¶¶ 43-44.

[63] *Id.* ¶ 45.

[64] *Id.*

Mr. Urvan received $50 million in cash and up to 20 million shares of AMMO common stock.[65] He also became an AMMO board member and its Chief Strategy Officer.[66] Added to that, SpeedLight assumed $52,277,699.25 in outstanding debt owed by IA Tech.[67]

Numerous Merger Agreement provisions are implicated in this dispute. First, Mr. Urvan raises four representations AMMO made in Section 5 of the Merger Agreement.

Section 5.7 provides in relevant part:

> There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to [AMMO]'s knowledge, currently threatened in writing (a) against [AMMO] or any officer, director or employee of [AMMO] arising out of their employment or board relationship with [AMMO]; (b) that questions the validity of this Agreement or the right of [AMMO] to enter into it, or to consummate the transactions contemplated by this Agreement; or (c) to [AMMO]'s knowledge, that reasonably would be expected to have, either individually or in the aggregate, a Material Adverse Effect. Neither [AMMO] nor, to [AMMO]'s knowledge, any of its officers, directors or employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or employees, such as would affect [AMMO]).

---

[65] Urvan's Compl. ¶ 46.

[66] *Id.* ¶ 50.

[67] *Id.* ¶ 47.

Section 5.11(b) provides in relevant part:

> None of [AMMO]'s directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to [AMMO] or, to [AMMO]'s knowledge, have any (i) material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of [AMMO]'s customers, suppliers, service providers, joint venture partners, licensees and competitors . . . .

Section 5.15(h) provides in relevant part:

> To [AMMO]'s knowledge, none of the Key Employees or directors of [AMMO] has been . . . (ii) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (iii) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from engaging, or otherwise imposing limits or conditions on his or her engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (iv) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

And Section 5.26 provides, in greater detail than is needed here, that (1) AMMO complied with all NASDAQ rules and SEC filing requirements; (2) AMMO's SEC filings accurately and fairly presented AMMO's financial position; and (3) AMMO maintained an adequate system of internal controls over its financial reporting to reasonably assure the reliability of its financial reporting.

-12-

AMMO, in turn, raises two of Mr. Urvan's representations that AMMO now contends were false. Specifically, in Merger Agreement Section 4.18(a), Mr. Urvan represented in relevant part:

> To [Gemini]'s knowledge, none of [Gemini]'s or any [Gemini] Subsidiary's employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to promote the interest of [Gemini] or a [Gemini] Subsidiary or that would conflict with [Gemini]'s or any [Gemini] Subsidiary's business.

Finally, Mr. Urvan represented in Section 4.27: "Except for Maxim Group LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of [Gemini]."

AMMO also raises Mr. Urvan's indemnification obligations under Section 9 of the Merger Agreement. The most relevant provisions to this dispute are Sections 9.5(a), (c), and (f). Section 9.5(a), which addresses "Third-Party Claims," provides in relevant part:

> If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "Third-Party Claim") against such Indemnified Party with respect to which the Indemnifying

-13-

Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than fifteen (15) calendar days after receipt of such notice of such Third-Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense . . . . The Indemnified Party shall have the right to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, provided that if in the reasonable opinion of counsel to the Indemnified Party, (A) there are material legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.

Section 9.5(c), which addresses "Direct Claims," provides in relevant part:

> Any Action by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. . . . If the Indemnifying Party does not so respond within such 30 day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

Last, Section 9.5(f), which addresses specific pre-existing claims, provides in relevant part:

> Notwithstanding anything to the contrary in this Section 9.5, [Mr. Urvan] shall have initial sole and exclusive control of the prosecution, defense and settlement of the Triton Matter and the [Tenor] Litigation in consultation with [AMMO], including, without limitation, the selection and termination of counsel with respect to such matter and all decisions related to the Triton Matter and/or the [Tenor] Litigation in good faith consultation with [AMMO] . . . . For the avoidance of doubt, neither [AMMO] nor any of

-15-

its Affiliates shall have the right to terminate any of the legal counsel currently handling the Triton Matter or [the Tenor] Litigation. Notwithstanding anything in this Agreement to the contrary, the parties agree legal counsel and strategy will be reviewed periodically and in good faith after six months from the Closing Date, and [Mr. Urvan] shall consult in good faith and work cooperatively together related to this matter.

## D. THE POST-MERGER EVENTS

### 1. Mr. Urvan's Proxy Battle

As demonstrated by SEC filings cited by the AMMO Entities,[68] Mr. Urvan initiated a proxy contest in August 2022.[69] In doing so, he sought to replace AMMO's entire board and to separate the legacy GunBroker business from AMMO's ammunition business.[70] Mr. Urvan also wanted to replace AMMO's then-CEO, Mr. Wagenhals.[71]

AMMO and Mr. Urvan settled the proxy contest in November 2022.[72] The settlement increased the size of the board to nine, with Mr. Urvan and his nominees filling three of those seats.[73] The agreement also called for a new four-member

---

[68] The Court may take judicial notice of these filings as explained below. *See infra* Section V(A)(1).

[69] AMMO's Mot., Ex. 5 (hereinafter, "Proxy Contest Settlement Agreement") § 1(a) (D.I. 36).

[70] Proxy Contest Settlement Agreement, Ex. C.

[71] *Id.*

[72] *See generally* Proxy Contest Settlement Agreement.

[73] Proxy Contest Settlement Agreement § 1(b).

-16-

committee to plan the succession of AMMO's CEO.[74]  Mr. Urvan and one of his nominees occupied two of those four positions.[75]

### 2.  Mr. Urvan's Refusals to Indemnify

Following the merger, the law firm Culhane Meadows PLLC represented Mr. Urvan and AMMO in the Triton Litigation.[76]  In May 2023, Culhane Meadows sent a letter to Mr. Urvan and AMMO explaining that it foresaw potential conflicts of interest between the defendants.[77]  Specifically, the letter stated:

> [T]hough the Defendants' interests remain aligned with respect to seeing that the Plaintiffs' complaint is dismissed and that no liability is assessed against any Defendant, because AMMO, Inc. purchased GBI and its subsidiaries GunBroker and IA Tech (collectively "the AMMO Companies"), while Mr. Urvan retains ownership of TVPI and is an individually named defendant, certain situations could arise where the Defendants may have divergent interests, or inquire of their counsel seeking attorney-client privileges, that could result in a potential, future conflict.  For example, we discussed with the parties' representatives the recent summary judgment ruling in the Federal Court action to which the Ammo Companies are not parties and [Mr.] Urvan's inquiry about moving the Cobb Action into Federal Court through a potential TVPI bankruptcy petition where the statute of limitations defense might be better received (an inquiry CM could not address because of the potential impacts to the Ammo-Owned Parties); and other potential pretrial strategies or positions that could not be discussed under the cloak of

---

[74]  Proxy Contest Settlement Agreement § 1(d).

[75]  *Id.*

[76]  AMMO's Am. Compl. ¶ 35.

[77]  *Id.*

-17-

> attorney-client privilege under a joint representation. Additionally, we discussed the advantages of each party being represented by separate counsel in terms of how the evidence might be viewed by or presented to a jury, separate (and thus additional) closing arguments and direct and cross examinations, etc.[78]

So, Culhane Meadows said it would withdraw as AMMO's counsel and suggested that AMMO retain the existing co-counsel, Litchfield Cavo LLP, which would correspondingly withdraw as Mr. Urvan's counsel.[79]

AMMO intended to follow that advice and retain Litchfield Cavo for itself.[80] Relying on the provisions of Merger Agreement Section 9.5(a), AMMO sent Mr. Urvan the $60,000 bill.[81] But Mr. Urvan refused to pay.[82] Indeed, Mr. Urvan allegedly failed to take any action to facilitate the change in counsel, so Culhane Meadows withdrew from the representation entirely, and AMMO was forced to retain new counsel.[83] Mr. Urvan hasn't agreed to pay for that new counsel either.[84]

Separately, and as referenced above, AMMO posted a $1.55 million appeal

---

[78] Urvan's Mot., Ex. 4 at 1-2.

[79] Urvan's Mot., Ex. 4 at 2; AMMO's Am. Compl. ¶ 37.

[80] AMMO's Am. Compl. ¶ 37.

[81] *Id.*

[82] AMMO's Am. Compl. ¶ 38.

[83] *Id.* ¶¶ 39-41.

[84] *Id.* ¶ 42.

bond in the Tenor litigation.[85] The premium on that bond was $38,750.[86] Though Mr. Urvan initially said that bill was AMMO's "problem to deal with," he has since remitted the premium.[87] Unsatisfied, AMMO now seeks unpaid fees and interest attributable to the appeal bond based on the Merger Agreement's indemnity provisions.[88]

### E. PROCEDURAL HISTORY

Mr. Urvan filed his complaint against the AMMO Entities in April 2023.[89] The AMMO Entities moved to dismiss it.[90] Then, AMMO filed its own complaint. The Court consolidated those two cases.[91] And soon after, AMMO amended its complaint.[92] Mr. Urvan then moved to dismiss that amended complaint.[93] Following full briefing, the Court heard oral argument and the competing dismissal motions are now ready for resolution.

---

[85] *Id.* ¶¶ 47-48.

[86] *Id.* ¶ 49.

[87] *Id.* ¶ 50; AMMO's Opp'n Br. at 46.

[88] AMMO's Opp'n Br. at 47.

[89] Urvan's Compl.

[90] AMMO's Mot.

[91] Sept. 11, 2023 Judicial Action Form (D.I. No. 55).

[92] AMMO's Am. Compl.

[93] Urvan's Mot.

## II. LEGAL STANDARD

"When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs."[94] "Dismissal is inappropriate 'unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.'"[95]

## III. PARTIES' CONTENTIONS

### A. AMMO ENTITIES' MOTION TO DISMISS

The list of the AMMO Entities' contentions is long—attacking every claim Mr. Urvan brings. Their first argument against is that Mr. Urvan's entire complaint is barred by laches.[96] Mr. Urvan primarily responds to this challenge by arguing that it is too fact dependent for this stage.[97] He also emphasizes his claims are within the three-year statute of limitations.[98]

Next, the AMMO Entities contest this Court's personal jurisdiction over the Individual Defendants, saying the Individual Defendants haven't had the

---

[94] *Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 84 (Del. Ch. 2023) (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011)).

[95] *Walton*, 294 A.3d at 84 (citing *Cent. Mortg.*, 27 A. 3d at 535).

[96] AMMO's Mot. at 20-27.

[97] Urvan's Brief Opposing the AMMO Entities' Motion to Dismiss (hereinafter "Urvan's Opp'n Br.") at 14-21 (D.I. 47).

[98] Urvan's Opp'n Br. at 14-21.

constitutionally required minimum contacts with Delaware.[99]  Mr. Urvan counters

that a recent United States Supreme Court decision obviates the need for contacts-

based due process analysis, so the applicable long-arm statutes are enough to confer

jurisdiction.[100]  He alternatively contends that the Individual Defendants' use of

Delaware law in crafting this merger, and their high-level positions within a

Delaware entity, constitute sufficient contacts with Delaware to satisfy due

process.[101]

Third, the AMMO Entities challenge the "falsity" and "justifiable reliance"

prongs of Mr. Urvan's fraudulent inducement claims.[102]  He says in this regard that

the AMMO Entities merely present factual disputes that must be explored in

discovery.[103]

The AMMO Entities' motion next aims at Mr. Urvan's aiding and abetting

count.  They contend there was no underlying fraud, and add that Mr. Urvan hasn't

plead "substantial assistance" with sufficient specificity.[104]  The AMMO Entities

also raise the intra-corporate conspiracy doctrine, saying officers and directors

---

[99]   AMMO's Mot. at 27-33.

[100]  Urvan's Opp'n Br. at 49-57 (citing *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028 (2023)).

[101]  Urvan's Opp'n Br. at 57-61.

[102]  AMMO's Mot. at 34-44.

[103]  Urvan's Opp'n Br. at 23-29.

[104]  AMMO's Mot. at 45-52.

cannot aid and abet their corporate principal.[105]  Mr. Urvan, of course, takes the opposite position on the first two arguments.[106]  Regarding the intra-corporate conspiracy doctrine, Mr. Urvan posits that it's inapplicable because the Individual Defendants were acting on personal motives instead of their roles as agents.[107]

The AMMO Entities likewise oppose Mr. Urvan's unjust enrichment count. They suggest it fails because: (1) there is no lack of justification; (2) the written contract governs the parties' relationship; and (3) as to the Individual Defendants, they were not directly enriched.[108]  Mr. Urvan counters that: (1) the alleged wrongdoing removes any justification; (2) a contract that is the product of fraud can't control; and (3) there is a reasonable inference the Individual Defendants directly profited from this  merger.[109]

Turning away from Delaware common law and toward the Arizona Securities Act (the "ASA"), the AMMO Entities argue two of the three provisions Mr. Urvan relies upon only apply to fraudulent schemes, not "misstatements and omissions."[110] Mr. Urvan retorts that the totality of the AMMO Entities' alleged misconduct

---

[105]  AMMO's Mot. at 52-54.

[106]  Urvan's Opp'n Br. at 34-36.

[107]  *Id.* at 36-37.

[108]  AMMO's Mot. at 59-60.

[109]  Urvan's Opp'n Br. at 46-48.

[110]  AMMO Mot. at 54-55.

amounted to a fraudulent scheme.[111]

Regarding A.R.S. § 44-1991(A)(2)—a close analogue to Delaware's common law fraud—the AMMO Entities again claim there were no misrepresentations and add that even if there were, they weren't material to the transaction.[112] Mr. Urvan again disagrees with that position and says it is, at most, a factual dispute not appropriate for this stage.[113] The parties also disagree about the interplay between the Merger Agreement's anti-reliance clause and the ASA's non-waiver provision and lack of a reliance element.[114]

## B. MR. URVAN'S MOTION TO DISMISS

Mr. Urvan's motion is similarly comprehensive. He first attacks AMMO's two claims of fraudulent inducement—one regarding the "Finder's Fee" representation, the other regarding the "Material Agreements" representation.[115] As to both, Mr. Urvan says they weren't false and he didn't have knowledge of their alleged falsity.[116] He also contends that even if AMMO could prove its claims with regard to the Finder's Fee representation, AMMO would have no damages.[117]

---

[111] Urvan Opp'n Br. at 45-46.

[112] AMMO's Mot. at 55-58.

[113] Urvan's Opp'n Br. at 38-39.

[114] AMMO's Mot. at 56-57; Urvan's Opp'n Br. at 40-45.

[115] Urvan's Mot. at 24-35.

[116] *Id.* at 25-28; 30-35.

[117] *Id.* at 28-30.

AMMO, in essence, counterargues that each of Mr. Urvan's defenses rest upon disputed facts.[118]

Like Mr. Urvan, AMMO restates its fraudulent inducement claims as violations of the ASA.[119] But, unlike Mr. Urvan, it cites only A.R.S. § 44-1991(A)(2).[120] To defeat that claim, Mr. Urvan says again he made no misrepresentations.[121] Mr. Urvan continues that the Gemini interests AMMO bought are not "securities," and so they aren't governed by the ASA.[122] AMMO responds that the stock Mr. Urvan received in this bargain implicate the ASA, and that it has adequately pled misrepresentations.[123]

Finally, Mr. Urvan's motion challenges AMMO's indemnification claims. Starting with the Triton Litigation, Mr. Urvan says it is exclusively governed by Section 9.5(f), which doesn't provide for reimbursement of attorney's fees.[124] And Mr. Urvan continues, that even if Section 9.5(a) did apply, there was no existing, non-waivable conflict that would entitle AMMO to fees.[125] AMMO, in opposition,

---

[118] AMMO's Opp'n Br. at 14-29.

[119] AMMO's Am. Compl. ¶¶ 120-25.

[120] *Id.* ¶ 122.

[121] Urvan's Mot. at 40.

[122] *Id.* at 36-40.

[123] AMMO's Opp'n Br. at 34-36.

[124] Urvan's Mot. at 42-45.

[125] *Id.* at 46-47.

reads Section 9.5(f) as supplementing, not replacing, Section 9.5(a), and says the Culhane Meadows letter triggered Section 9.5(a)'s the reimbursement provision.[126]

Turning to the fees and interest relating to the Tenor Litigation's now-paid appeal bond premium, Mr. Urvan says AMMO did not fulfill its notice obligations.[127] AMMO contends additional notice wasn't needed because this claim was already well known to Mr. Urvan and he repudiated payment.[128] AMMO adds that, in any event, Mr. Urvan did not suffer the prejudice required to transfigure a lack of notice into a defense under the Merger Agreement.[129]

As for Count III's fee-shifting claim, Mr. Urvan says AMMO's request for fees generated in this action is unripe, and he again argues a lack of notice.[130] AMMO contends that Delaware courts routinely maintain fee-shifting claims, and that its Complaint provided Mr. Urvan all the notice he is entitled to.[131]

---

[126] AMMO's Opp'n Br. at 37-46.

[127] Urvan's Mot. at 48-50.

[128] AMMO's Opp'n Br. at 48-49.

[129] *Id.* at 49-50.

[130] Urvan's Mot. at 50-52.

[131] AMMO's Opp'n Br. at 50-53.

## IV. DISCUSSION

### A. THE AMMO ENTITIES' MOTION TO DISMISS MR. URVAN'S COMPLAINT

#### 1. The Court May Consider Certain Limited Evidence, Including SEC Filings and Court Records.

To start, it is necessary to address the limits of the Court's ability to consider documents outside a complaint without transforming a motion to dismiss into one for summary judgment. This is so because the AMMO Entities reference SEC filings and court records from other litigation in support of their arguments.[132] In short, both types of documents may, via judicial notice, be considered at this stage.

This Court will consider SEC filings at the motion to dismiss stage when they "are not subject to reasonable dispute under Delaware Rule of Evidence 201."[133] SEC filings may also be considered if the movant "is not offering them for the truth of the matter asserted."[134] Though the documents in *Narrowstep* did not satisfy those criteria, it specifically distinguished "a situation in which a court takes judicial notice of proxy disclosures, not to determine whether they are truthful, but as evidence of whether certain information has or has not been disclosed."[135] Just so here.

---

[132] *See, e.g.*, AMMO's Mot. at 5, 8.

[133] *Smart Local Unions and Councils Pension Fund v. BridgeBio Pharma, Inc.*, 2022 WL 17986515, at *9 n.114 (Del. Ch. Dec. 29, 2022) (citing *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006)).

[134] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *6 (Del. Ch. Dec. 22, 2010).

[135] *Narrowstep*, 2010 WL 5422405, at *6.

Accordingly, the SEC filings may be considered for that limited purpose and as the integral facts are undisputed by Mr. Urvan.[136]

Likewise, the AMMO Entities refer to some of Mr. Urvan's filings in federal litigation.[137] These, too, may be considered. "This Court has repeatedly held federal court decisions, orders, and filings judicially noticeable."[138] So, while the Court is not yet at a factfinding stage and will thus not weigh any evidence,[139] it need not blind itself to the materials the AMMO Entities rely upon.

### 2. Laches Does Not Bar Mr. Urvan's Claims at this Stage.

Turning to more substantive issues, the AMMO Entities claim Mr. Urvan's complaint is barred in its entirety by the doctrine of laches. "The equitable defense of laches is based on the theory that upon a person's acquiring knowledge of a wrong affecting his rights, any unreasonable delay in asserting an equitable remedy will bar such form of relief."[140] There are two elements to this defense: "(i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting

---

[136] Mr. Urvan also seeks to exclude AMMO's code of conduct, which purportedly imputed reporting requirements on employees (including Mr. Urvan), who believed AMMO was engaged in unlawful practices. Urvan's Opp'n Br. at 31 n.13. That code, though, is contained in AMMO's public SEC filings, and its contents are undisputed. *See* AMMO, Quarterly Report (Form 10-Q) (Feb. 12, 2021) at Ex. 14.1. In any event, it has little bearing on the Court's analysis.

[137] *See* AMMO's Mot. at 8 n.5.

[138] *In re Ebix, Inc. Stockholder Litig.*, 2016 WL 208402, at *10 (Del. Ch. Jan. 15, 2016).

[139] *Goldstein v. Denner*, 2022 WL 1671006, at * 55 (Del. Ch. May 26, 2022).

[140] *Mellado v. ACPDO Parent Inc.*, 2023 WL 8086840, at *11 (Del. Ch. Nov. 21, 2023) (quoting *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 682 (Del. Ch. 1978)).

prejudice to the defendant."[141] Neither of those fact-driven elements is conducive to a determination at this stage.

To demonstrate Mr. Urvan knew the bases of his claims well before bringing suit, the AMMO Entities point to SEC disclosures related to the misconduct Mr. Urvan now alleges—many of which predate the merger—as well as the more robust information Mr. Urvan became privy to as an AMMO director.[142] The AMMO Entities then say Mr. Urvan's delay was unreasonable because: (1) the challenged representations had a ninety-day survival period; (2) AMMO's code of conduct, to which Mr. Urvan was bound, required immediate reporting of the types of allegations Mr. Urvan now brings; and, (3) Mr. Urvan's proxy challenge was an additional opportunity for Mr. Urvan to have raised these allegations.[143] As for prejudice, the AMMO Entities point to AMMO's costly efforts to integrate GunBroker into its business, as well as the prejudice to AMMO shareholders who invested in AMMO while Mr. Urvan was sitting on these claims.[144]

Those facts may raise the specter of laches, but Mr. Urvan's entitlement to relief is not inconceivable. Reasonableness is inherently a fact-sensitive issue. Even

---

[141] *Mellado*, 2023 WL 8086840, at *11 (quoting *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1194 (Del. Ch. 2022)).

[142] AMMO's Mot. at 20-23.

[143] *Id.* at 24-25.

[144] *Id.* at 26.

in the more factually nourished context of summary judgment, a laches defense is "rarely granted."[145] Too, Mr. Urvan's claims were brought within the analogous statutes of limitation.[146] "Delaware courts presume, in the absence of exceptional circumstances, that an action filed within the analogous limitations period was neither the product of unreasonable delay nor the cause of undue prejudice."[147] The Court won't disregard that presumption on only the limited facts now before it.

### 3. The Claims Against AMMO and Speedlight:

#### a. The Fraudulent Inducement Count is adequately pled.

In Count I of his complaint, Mr. Urvan insists that AMMO and SpeedLight fraudulently induced him to enter the Merger Agreement based on purported misrepresentations contained in Merger Agreement Sections 5.7, 5.11, 5.15, and 5.26.[148] This Count survives this stage.

To support a claim for fraudulent inducement, a plaintiff must plead facts that support an inference that:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or

---

[145] *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 79 (Del. Ch. 2013).

[146] The representations' survival period expressly did not apply to fraud claims. Thus, it does not operate as an analogue to a statute of limitations for Mr. Urvan's claims. *See* MA § 9.9.

[147] *Meso Scale*, 62 A.3d at 79 (citing *Whittington v. Dragon Grp., LLC*, 991 A.2d 1, 9 (Del. 2009)).

[148] Urvan's Compl. ¶¶ 128-35.

-29-

refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[149]

Additionally, to satisfy Rule 9(b), the complaint must allege: "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[150]  This is easily done when the challenged representations are derived from a written contract.[151]

The AMMO Entities concede that they have not challenged those elements r the "Key Employees" representation in Section 5.15, instead relying on their laches argument for that claim.[152]  That alone is enough to get this unified count through the pleading stage.[153]  In any event, the AMMO Entities arguments are unpersuasive.

The AMMO Entities broadly contend that Mr. Urvan wasn't justified in

---

[149] *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[150] *Abry Partners*, 891 A.2d at 1050 (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).

[151] *River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2021 WL 598539, at *4 (Del. Super. Ct. Feb. 4, 2021) (quoting *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015)).

[152] AMMO Entities' Reply Brief in Further Support of their Motion to Dismiss Urvan's Complaint (hereinafter "AMMO's Reply Br.") at 14 n.8 (D.I. 62).

[153] *inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4-6 (Del. Super. Ct. Jan. 26, 2021) ("[A]t the pleading stage of a case, a trial judge is not a robed gardener employing Rule 12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim."); *see also Envolve Pharm. Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 855866, at *4 n.45 (Del. Super. Ct. Mar. 8, 2021) ("[I]t is not generally the Court's duty to dissect a single claim for either dismissal or rescue of its constituent theories of liability.").

relying on the express contractual representations because he had access to contradictory extra-contractual information. But "[a] buyer justifiably may rely on contractual representations."[154] And as the AMMO Entities themselves recognize, "[t]hrough the Anti-Reliance Provision, [Mr.] Urvan effectively disclaimed reliance on extra-contractual representations."[155] Put differently, the parties agreed to rely exclusively on the contents of the Merger Agreement's representations. The AMMO Entities are hard-pressed to now say that Mr. Urvan should have ignored those representations in favor of outside information.

The AMMO Entities' representation-specific arguments regarding the falsity element are likewise unavailing. Beginning with Section 5.7's "Litigation Representation," the AMMO Entities conflate distinct clauses within that representation to limit Section 5.7's scope to litigation that threatens the merger or could give rise to a material adverse effect. In doing so, the AMMO Entities hope to remove Ms. Hanrahan's litigation from the Litigation Representation's reach. But Section 5.7 is not so limited.

Section 5.7 lists three categories of litigation as within its scope. Section 5.7(a) covers litigation "against [AMMO] or any officer, director or employee of

---

[154] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *24 (Del. Super. Ct. July 29, 2021).

[155] AMMO's Mot. at 34.

[AMMO] arising out of their employment or board relationship with [AMMO]."[156]

Section 5.7(b) contemplates litigation "that questions the validity of this Agreement or the right of [AMMO] to enter into it, or to consummate the transactions contemplated by this Agreement"[157] And Section 5.7(c) discusses litigation "that reasonably would be expected to have, either individually or in the aggregate, a Material Adverse Effect."[158] This last option is set off with "or".[159] The AMMO Entities aver that a litigation has to fall under both Section 5.7(a) *and* either 5.7(b) or 5.7(c) to implicate this representation. Not so. The falsity of Section 5.7(a) is enough to make the Litigation Representation false.

The AMMO Entities next say Section 5.11's "Related-Party Transaction Representation" is inadequately pled under Rule 9(b) because Mr. Urvan's complaint based an integral assertion "on information and belief."[160] But the fact in question is stated definitively elsewhere in Mr. Urvan's complaint.[161] The AMMO Entities also suggest the disputed transaction was on market terms, making it acceptable. But Section 5.11 has no qualifier that a related-party transaction must

---

[156] MA § 5.7(a).

[157] *Id.* § 5.7(b).

[158] *Id.* § 5.7(c).

[159] *Id.* § 5.7.

[160] AMMO's Mot. at 39.

[161] Urvan's Compl. ¶ 74.

be unfair to AMMO to implicate the representation.[162]  The facts alleged by Mr. Urvan, if proven, would make this representation untrue.

Turning to the representations contained in Section 5.26, the AMMO Entities raise factual issues about:  (1) what AMMO—as opposed to its executives—was required to report; (2) the accuracy of its financial statements; and, (3) the adequacy of its internal controls.[163]  In this context, the AMMO Entities impermissibly seek to use SEC filings to prove disputed facts.  As discussed, the Court may properly notice facts "not subject to reasonable dispute."[164]  That does not permit a movant to challenge a complaint's factual allegations by relying on the truth of a public filing's contents.[165]  Taken as true, as they must in this posture, Mr. Urvan's allegations regarding the invalidity of AMMO's SEC filings, financial statements, and internal controls are a conceivable basis of fraudulent inducement.  No more is required to overcome a Rule 12(b)(6) motion.

In sum, the uncontested falsity of Section 5.15 is enough to maintain Count I in its entirety.  Even if it weren't, the AMMO Entities have not established that any of Mr. Urvan's fraudulent inducement theories are inconceivable.  Accordingly, the AMMO Entities' motion is denied as to this Count.

---

[162]  MA § 5.11(b)(i).

[163]  AMMO's Mot. at 40-44.

[164]  *Smart Local Unions*, 2022 WL 17986515, at *9 n.114.

[165]  *Narrowstep*, 2010 WL 5422405, at *6.

**b. The Arizona Securities Act Count is adequately pled.**

Count III of Mr. Urvan's complaint charges the AMMO Entities with violations of ASA §§ 44-1991(A)(1)-(3). Those provisions make it unlawful to (1) "[e]mploy any device, scheme or artifice to defraud"; (2) "[m]ake any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or (3) "[e]ngage in any transaction, practice or course of business which operates or would operate as a fraud or deceit" in connection with the sale of a security.[166]

The AMMO Entities engage a three-fronted assault on Mr. Urvan's statutory claims. First, they say the relevant misrepresentations are confined to those expressed in the Merger Agreement, as opposed to extracontractual misstatements. Second, they contend ASA Subsection 44-1991(A)(2) was not violated because Mr. Urvan cannot prove a "material" misrepresentation. And third, they argue ASA Subsections 44-1991(A)(1) and (A)(3) are inapplicable because those require a fraudulent scheme in excess of discrete misrepresentations. None of these arguments warrant Count III's dismissal.

First, *Golden v. ShootProof Holdings, LP*[167] instructs that anti-reliance and

---

[166] ARIZ. REV. STAT. ANN. §§ 44-1991(A)(1)-(3) (2021).

[167] 2023 WL 2255953 (Del. Ch. Feb. 28, 2023).

integration clauses may limit the scope of statutory claims even where reliance is not an element of the statute, and the statute contains an anti-waiver provision.[168] That recent precedent considered a nearly identical statute and Mr. Urvan has offered no compelling basis to diverge from its reasoning. In turn, Mr. Urvan might not be able to base his ASA claims on extracontractual statements. Nevertheless, several of Mr. Urvan's ASA claims do find root in express contractual representations and thus remain viable.

The AMMO Entities' argument regarding the materiality requirement is less persuasive. They suggest that even if the representations Mr. Urvan now challenges were false, that would not have stopped him from closing the deal.[169] But Mr. Urvan specifically pled that "[h]ad [he] known of the true state of facts concerning AMMO, he would not have entered into the Merger Agreement or completed the Merger on the terms set forth therein."[170] Once again, the AMMO Entities prematurely seek resolution of a disputed fact.

Mr. Urvan has a viable claim under A.R.S. § 44-1991(A)(2), so Count III withstands the AMMO Entities' motion.[171] While the Court need dwell no further on Mr. Urvan's ASA claims, it is worth noting that Arizona federal courts have held

---

[168] *Golden*, 2023 WL 2255953, at *11-15, n.107.

[169] AMMO's Mot. at 57-58.

[170] Urvan's Compl. ¶ 149.

[171] *See inVentiv Health*, 2021 WL 252823, at *4-6; *Envolve Pharm.*, 2021 WL 855866, at *4 n.45.

"that liability under § 44–1991(A)(1) and (3) could not be premised solely on assertions of misstatements and omissions."[172] To do so would conflate those two subsections with (A)(2).[173] That said, whether Mr. Urvan can prove fraud in excess of misrepresentations is a question for another time.

### c. The Unjust Enrichment Count is adequately pled.

The AMMO Entities challenge Mr. Urvan's unjust enrichment charge in Count V based on two primary theories. First, the AMMO Entities insist that they committed no wrongdoing that made their enrichment unjust. For the reasons detailed above, that cannot be decided at this stage. Second, they say the Merger Agreement governs their relationship and so this quasi-contractual claim cannot go forward. Despite the AMMO Entities' argument, at this stage, the unjust enrichment count survives as an alternative basis of relief.

As this Court has explained, "[u]nder Delaware law, '[i]f a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied.'"[174] Nevertheless, "the 'contract itself is not necessarily the measure of [the]

---

[172] *In re Allstate Life Ins. Co. Litig.*, 2013 WL 5161688, at *13 (D. Ariz. Sept. 13, 2013) (citing *Red River Res., Inc. v. Mariner Sys., Inc.*, 2012 WL 2507517, at *10 (D. Ariz. June 29, 2012)).

[173] *In re Allstate*, 2013 WL 5161688, at *13 (quoting *Red River*, 2012 WL 2507517, at *10).

[174] *S'holder Representative Servs. LLC v. RSI Holdco, LLC*, 2019 WL 2207452, at *8 (Del. Ch. May 22, 2019) (alteration in original) (quoting *RCS Creditor Tr. v. Schorsch*, 2018 WL 1640169, at *7 (Del. Ch. Apr. 5, 2018)).

plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing . . . and the [defendant] has been unjustly enriched by the benefits flowing from the contract.'"[175]

Where unjust enrichment serves as an alternative basis of relief, this Court will not dismiss it. For example, in *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*,[176] this Court explained that "if the Plaintiffs prevail on their tort claims, unjust enrichment is unavailable, because an element of unjust enrichment is lack of a remedy at law."[177] It continued, though, that if the plaintiffs could show a wrongful enrichment at their expense but were "unable to implicate the Moving Defendants in that fraud, unjust enrichment would be invoked."[178] Similarly, the Court in *McPadden v. Sidhu* stated, "[i]f plaintiff has pleaded and then prevails in demonstrating that the same conduct results in both liability for breach of . . . fiduciary duties and disgorgement via unjust enrichment, plaintiff then will have to elect his remedies."[179]

Here, perhaps Mr. Urvan would have an adequate remedy at law if the Merger Agreement was the product of fraud. But for now, it is at least conceivable that a

---

[175] *S'holder Representative Servs.*, 2019 WL 2207452, at *8 (first and third alterations in original) (quoting *RCS Creditor Tr.*, 2018 WL 1640169, at *7).

[176] 2014 WL 6703980 (Del. Ch. Nov. 26, 2014).

[177] 2014 WL 6703980, at *28.

[178] *Great Hill Equity Partners*, 2014 WL 6703980, at *28.

[179] 964 A.2d 1262, 1276 (Del. Ch. 2008).

situation might arise where a tort-based remedy would not fully redress Mr. Urvan's alleged harm.[180] The Court will not dismiss Count V until its inapplicability becomes certain.

### 4. The Claims Against the Individual Defendants:

#### a. The Court has personal jurisdiction over the Individual Defendants.

The AMMO Entities argue this Court lacks personal jurisdiction over the Individual Defendants. As a preliminary matter, the Court has statutory jurisdiction over the Individual Defendants pursuant to 10 *Del. C.* § 3114 and 6 *Del. C.* § 18-109. The AMMO Entities' argument on that point—or lack thereof—concedes as much. So, the remaining question is whether the constitutional due process requirement is met. That is, whether "'certain minimum contacts' exist between the defendant[s] and the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[181] Here, that standard is met.

---

[180] For example, AMMO suggests it wouldn't be able to satisfy a $140 million judgment, which is the amount Mr. Urvan seeks. *See* AMMO's Reply Br. at 12. So, it is at least possible that he might seek damages from those Individual Defendants who benefitted from the merger but did not themselves engage in tortious conduct.

[181] *Illumina, Inc. v. Guardant Health, Inc.*, 2023 WL 1407716, at *14 (D. Del. Jan. 31, 2023) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### i. Mallory *did not upend Delaware's personal jurisdiction jurisprudence.*

At the outset, Mr. Urvan's argument regarding due process starts with a bold proposition: "the historical two-prong test employed by Delaware courts to evaluate whether they may exercise person jurisdiction over nonresident defendants is no longer applicable when a consent statute is involved."[182]  Mr. Urvan takes this position based on *Mallory v. Norfolk Southern Railway Co.*,[183] a June 2023 plurality opinion from the United States Supreme Court.  His stance, as of now, is incorrect.

In *Mallory*, a divided Court subjected Norfolk Southern to Pennsylvania's jurisdiction based upon its much earlier holding in *Pennsylvania Fire Insurance Company of Philadelphia v. Gold Issue Mining & Mineral Company*.[184]  The *Mallory* Court explained that "Pennsylvania law is explicit that 'qualification as a foreign corporation' shall permit state courts to 'exercise general personal jurisdiction' over a registered foreign corporation, just as they can over domestic corporations."[185]  Then, harkening to *Pennsylvania Fire*, the Court ruled that "suits premised on these grounds do not deny a defendant due process of law."[186]  In other words, a foreign corporation's statutory consent to jurisdiction satisfies

---

[182] Urvan's Opp'n Br. at 50.

[183] 600 U.S. 122 (2023).

[184] 243 U.S. 93 (1917).

[185] 600 U.S. at 135 (quoting 42 PA. CONS. STAT. § 5301(a)(2)(i)).

[186] *Mallory*, 600 U.S. at 135.

*International Shoe*'s due process requirement.

Notably, the majority explicitly limited *Mallory*'s interpretation to Pennsylvania's unique statutory scheme.[187] That scheme is atypically precise in declaring that registering to do business constitutes consent to personal jurisdiction.[188] Delaware's statute, in contrast, makes no such pronouncement.[189] So, whether this state's business registration requirements extract consent to jurisdiction from registrants is a matter of statutory interpretation. Our Supreme Court's most recent guidance holds that they do not.

In *Genuine Parts*, the Delaware Supreme Court faced this question head-on in the light of the United States Supreme Court's then-recent decision in *Daimler AG v. Bauman*.[190] The then-Chief Justice, writing for the majority, concluded, "Delaware's registration statutes must be read as a requirement that a foreign corporation must appoint a registered agent to accept service of process, but not as a broad consent to personal jurisdiction in any cause of action, however unrelated to the foreign corporation's activities in Delaware."[191] This Court isn't free to

---

[187] *Id.* at 135-36.

[188] *Mallory v. Norfolk S. Ry. Co.*, 266 A.3d 542, 564 (Pa. 2021) ("[T]he precise issue presented in this appeal may be peculiar to Pennsylvania. . . . [M]ost state statutes do not provide expressly that the act of registering to do business constitutes a specific basis upon which a court may assert general jurisdiction over all claims against a foreign corporation."), *vacated*, 600 U.S. 122 (2023).

[189] *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 142 (Del. 2016).

[190] 137 A.3d at 125-26 (discussing *Daimler AG v. Bauman*, 571 U.S. 117 (2014)).

[191] *Genuine Parts*, 137 A.3d at 127.

disregard that clear instruction.[192]

The Court is cognizant that much of the reasoning in *Genuine Parts* was based upon due process concerns now quelled by *Mallory*'s reinvigoration of *Pennsylvania Fire*.[193] But the opinion was also grounded in more routine principles of statutory interpretation and guided by policy considerations.[194] It's not this Court's place to second-guess *Genuine Parts*' careful legal construct simply because an outside view of a single factor has been altered. Rather, only the Delaware Supreme Court may revisit its own interpretation of the key Delaware statutes. Until then, *Genuine Parts* controls.

### ii. The Individual Defendants have sufficient minimum contacts to confer personal jurisdiction.

With the understanding that *International Shoe*'s due process test still applies, the Individual Defendants' contacts with Delaware satisfy it. How?

Besides acting as officers and directors of a Delaware corporation, the Individual Defendants—in their corporate roles—formed a new Delaware limited liability company to effect the merger. Also, while Gemini itself was a Nevada limited liability company, GunBroker—the true target of the acquisition—was "a

---

[192] *In re Tesla Motors, Inc. S'holder Litig.*, 2020 WL 553902, at *6 (Del. Ch. Feb. 4, 2020) ("This Court follows Supreme Court precedent . . . ." (citing *Am. Int'l Grp., Inc. v. Greenberg*, 965 A.2d 763, 818 (Del. Ch. 2009))).

[193] *Genuine Parts*, 137 A.3d at 138, 141-42.

[194] *Id.* at 139-41, 143-44.

group of Delaware companies."[195]  Moreover, the Merger Agreement is laden with references to Delaware law and designates Delaware as the applicable forum and source of law.  And the Individual Defendants' alleged wrongs are directly connected to their positions as Delaware officers and directors.  In sum, the Individual Defendants can hardly be surprised at being required to defend their actions in this state.

Hazout v. Tsang Mun Ting supports personal jurisdiction here.[196]  The Hazout defendant was the president, CEO, and director of a Canada-based Delaware corporation.[197]  He served as the lead negotiator in the transfer of that Delaware corporation to a Hong Kong-based group of investors.[198]  The series of key operative agreements called for the application of Delaware law in a Delaware forum.[199]  After the defendant kept $1 million of the plaintiff's money without completing the transfer, the plaintiff sued him in our Superior Court.[200]  The defendant insisted Delaware had no basis for the exercise of personal jurisdiction over him.[201]

In its due process analysis, the Supreme Court first noted that the defendant

---

[195] Urvan's Compl. ¶ 2.

[196] 134 A.3d 274 (Del. 2016).

[197] Hazout, 134 A.3d at 277.

[198] Id.

[199] Id.

[200] Id.

[201] Id.

availed himself of Delaware law by being an officer and director of a Delaware corporation.[202] It continued, "[m]ore important, the claims against Hazout involve his actions in his official capacity of negotiating contracts that involved the change of control of a Delaware public corporation."[203] Too, the Court noted that the relevant agreements "reflected the parties' choice to use the law of Delaware as their common language of commerce, and their understanding that litigation over later contractual differences could ensue in Delaware."[204] For those reasons, the Court concluded, "Hazout cannot fairly say he did not foresee that he would be subject to litigation in Delaware over his conduct in connection with negotiating the Change of Control Agreements."[205] The *Hazout* Court didn't even consider it a close case.[206]

The AMMO Entities', in opposition, chiefly rely upon *BAM International, LLC v. MSBA Group Inc.*[207] There, the parties' dispute centered on an escrow agreement—not the merger of Delaware entities.[208] The only real connection to Delaware was the relevant individuals' status as Delaware officers and the

---

[202] *Hazout*, 134 A.3d at 292.

[203] *Id.* at 293.

[204] *Id.*

[205] *Hazout*, 134 A.3d at 293-94.

[206] *Id.* at 292.

[207] 2021 WL 5905878 (Del. Ch. Dec. 14, 2021).

[208] *BAM*, 2021 WL 5905878, at *3.

agreement's forum-selection clause.[209]  The Court there added, "the actions allegedly giving rise to [the defendants'] liability were not taken as officers of [the Delaware entity]."[210]  It described the escrow agreement as "a garden-variety commercial contract, rather than one necessarily implicating Delaware interests."[211] That is notably distinct from the Delaware-focused Merger Agreement here.

Due process is satisfied here.  The merger at issue here took advantage of Delaware law both in its preparation—forming SpeedLight as a Delaware limited liability company—and its execution—referring extensively to Delaware law in the terms of the Merger Agreement.  To the extent the Individual Defendants were involved in the negotiation, approval, and execution of this merger, they cannot fairly claim they did not foresee potentially litigating in Delaware.  Thus, as in *Hazout*, requiring the Individual Defendants to defend themselves here "does not 'offend traditional notions of fair play and substantial justice.'"[212]  Accordingly, this Court's exercise of personal jurisdiction over the Individual Defendants is proper.

### b. The Aiding and Abetting Claim is deficient.

Notwithstanding this Court's jurisdiction over the Individual Defendants, Mr. Urvan's common law aiding and abetting claim is untenable.  It is barred by the

---

[209]  *Id.* at *10.

[210]  *Id.*

[211]  *BAM*, 2021 WL 5905878, at *9.

[212]  *Hazout*, 134 A.3d at 294 (quoting *Int'l Shoe*, 325 U.S. at 316).

-44-

intra-corporate conspiracy doctrine. As this Court has explained:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. Accordingly, it is entirely sensible that, as a general rule, agents of a corporation cannot conspire with one another or aid and abet each other's torts. The only instance where this general rule will not apply is when a corporate officer steps out of her corporate role and acts pursuant to personal motives.[213]

In the face of this principle, Mr. Urvan attempts to argue the Individual Defendants were not truly acting as AMMO's agents when they allegedly assisted AMMO in defrauding him. He does so via a three-sentence argument suggesting the Individual Defendants' real motive in making the challenged representations was their desire to hide their purported wrongdoing.[214] But if a cover-up was the Individual Defendants' true intention, engaging in a significant merger and making affirmative misrepresentations in the process was a poor way of going about it. The Individual Defendants had at least two much safer options. First, they could have simply not acquired GunBroker. Second, they could have declined to make any representations as to these issues instead of risking the very litigation that is now dredging up these unflattering facts. To the extent the Individual Defendants

---

[213] *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *17 (Del. Ch. June 11, 2020) (internal quotation marks and citations omitted).

[214] Urvan's Opp'n Br. at 37.

participated in these alleged misrepresentations, it seems apparent that they were trying to help get AMMO a favorable deal, not hide misdeeds.  So says Mr. Urvan himself.

In his complaint, Mr. Urvan alleged that "AMMO and SpeedLight engaged in intentional fraud *to induce Urvan to consummate the Merger*."[215]  That fraud is what Mr. Urvan alleges the Individual Defendants countenanced.[216]  Even now, Mr. Urvan argues:

> [The AMMO Entities'] fraudulent scheme included efforts to conceal other misconduct from [him], including AMMO's internal financial control weaknesses, insider trading, and OSHA's active investigation of the Whistleblower Complaint. *All of this was done for the purpose of manipulating [him] into agreeing to a deal* in *which a majority of the consideration he received was in the form of AMMO equity, not cash*.[217]

It cannot be maintained that the fraud's purpose was to get an unfairly beneficial deal for AMMO but, at the same time, the people who put that deal together had abandoned their corporate roles in order to benefit themselves.  Because the Court will not draw unreasonable inferences in the non-movant's favor, the intra-corporate conspiracy doctrine stands in the way of Count II.

---

[215] Urvan's Compl. ¶ 137 (emphasis added).

[216] *Id.* ¶ 138.

[217] Urvan's Opp'n Br. at 46.

### c. The Unjust Enrichment Claim is adequately pled.

The AMMO Entities make an argument against Mr. Urvan's unjust enrichment claim that is unique to the Individual Defendants. They say that any benefit to the Individual Defendants is too attenuated to conceivably provide relief to Mr. Urvan. At this stage, this argument is unavailing.

The lone case the AMMO Entities cite for this point is *OptimisCorp v. Atkins*.[218] There, this Court recited that "[a]n enrichment 'must not be speculative, attenuated, or too indirect to support a relationship to the loss.'"[219] The purpose of that rule is to ensure the Court can accurately undo the unjust enrichment.[220] In *OptimisCorp*, the plaintiff, after discovery, alleged a "butterfly effect[]" theory of damages based on the defendants' subsidiary's competitor being harmed by the defendants' wrongful conduct.[221] The plaintiff claimed that reduction in competition necessarily benefitted the defendants.[222] The circumstances and allegations here are quite different.

There is a reasonable inference that the directors and officers involved in this

---

[218] 2023 WL 3745306 (Del. Ch. June 1, 2023).

[219] *OptimisCorp*, 2023 WL 3745306, at *25 (quoting *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2019 WL 7369198, at *31 (Del. Ch. Dec. 31, 2019)).

[220] *OptimisCorp*, 2023 WL 3745306, at *25 (quoting *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 61 (Del. Ch. 2012)).

[221] *OptimisCorp*, 2023 WL 3745306, at *25.

[222] *Id.*

merger, most of whom were AMMO stockholders, received some quantifiable benefit from the transaction. Of course, Mr. Urvan will need to prove that before he can recover; but the fact that he hasn't yet done so isn't fatal. Greater factual development is needed before ruling that there is no traceable connection between the Individual Defendants' allegedly unjust gains and Mr. Urvan's losses.

## B. MR. URVAN'S MOTION TO DISMISS AMMO'S AMENDED COMPLAINT

### 1. The Fraudulent Inducement Claims:

#### a. The Material Agreements Representation Count is adequately pled.

Count IV of AMMO's amended complaint alleges that Section 4.18's "Material Agreements" representation was untrue because the Verska Agreement was undisclosed. AMMO contends that the Verska Agreement divided Mr. Verska's loyalty and thus conflicted with Gemini's post-closing operations. Mr. Urvan responds that the Verska Agreement did not create obligations as contemplated by Section 4.18. He continues that AMMO's allegations as to the Verska's Agreement are speculative. And he concludes that he had no knowledge of any fraud. But none of those airings gain him dismissal at this stage.

As an initial matter, Mr. Urvan reads Section 4.18 too narrowly. It doesn't say that no employees have explicit obligations under a written contract that would directly interfere with their role at AMMO. Instead, it says no Gemini employee "is obligated under any contract (including licenses, covenants or commitments of any

-48-

nature) or other agreement" in a way that would conflict with their duties to AMMO.[223]   AMMO's amended complaint alleges that there was an implicit agreement between Mr. Verska and Mr. Urvan baked into the Verska Agreement that Mr. Verska would promote Mr. Urvan's personal interests.  If AMMO proves such an accord existed, it might well fit within Section 4.18's broad language.

Mr. Urvan's argument that the existence of any such side agreement is speculative is inefficacious at this point.  Though AMMO might have an uphill battle in proving this allegation, it is no doubt conceivable.  At least three facts tend to support a reasonable inference that Mr. Verska agreed to act at Mr. Urvan's behest in conflict with his duties to GunBroker's new owner.  First, the $1 million annual payment under the Verska Agreement was quadruple Mr. Verska's normal salary.  Second, Mr. Verska allegedly undertook actions that were inconsistent with AMMO's desires and that promoted the interest of "Urvan era" employees and vendors.  Third, when Mr. Verska was fired for insubordination, Mr. Urvan stopped making payments under the Verska Agreement.  Taken together, those facts raise a reasonable inference that Mr. Urvan was truly paying for Mr. Verska's servility so that Mr. Urvan could surreptitiously influence GunBroker's operations.

Last, Mr. Urvan's argument regarding knowledge is misaimed.  It eyes what Mr. Urvan knew about Mr. Verska's activity post-closing—but that is not the target.

---

[223]  MA § 4.18(a).

The relevant knowledge is Mr. Urvan's knowledge of the existence of his alleged pre-closing agreement. If an undisclosed agreement between Mr. Urvan and Mr. Verska existed, Mr. Urvan would necessarily have had knowledge of it.

In sum, Mr. Urvan merely raises factual disputes about the truth of AMMO's allegations. While the evidence may ultimately vindicate him, deciding so isn't the Court's role on a motion to dismiss. Instead, the question is whether AMMO's allegations, if proven, might conceivably give rise to relief. They could. So, the answer to that question is yes.

### b. The Finder's Fee Representation Count is adequately pled.

Count V of AMMO's amended complaint alleges Mr. Urvan lied in Section 4.27's "Finder's Fee" representation. It claims that Mr. Urvan owed undisclosed fees to HL and Mr. Hayden. Mr. Urvan first responds that AMMO's amended complaint alleged *Mr. Urvan* owed fees to HL and Mr. Hayden when Section 4.27 only mentions fees owed by *Gemini*.[224] He then argues that AMMO failed to adequately plead that any fees were owed to HL or Mr. Hayden. Mr. Urvan next suggests that AMMO didn't sufficiently plead that Mr. Urvan knew about fees owed to HL or Mr. Hayden. And last, Mr. Urvan says, even if fees were owed to HL or Mr. Hayden, that did not damage AMMO. None of these arguments deliver dismissal.

---

[224] *See* AMMO's Am. Compl. ¶ 73.

At the outset, there appears some merit to Mr. Urvan's argument regarding the fees purportedly owed to HL. The HL agreement had specific requirements for a tail fee. AMMO has not pled that those requirements were met. Moreover, the fact that HL has not sought any fees in the years since the merger belies AMMO's argument that HL is entitled to a payment. That said, the failure of one theory supporting a larger count isn't decisive on a motion to dismiss.[225]

Turning to the fees owed to Mr. Hayden, AMMO's pleading that "the representation failed to disclose that Mr. Urvan owed Mr. Hayden a finder's fee,"[226] does not necessitate dismissal. If Section 4.27 had read "Gemini owes no fee to a broker, finder or investment banker," then perhaps only pleading that Mr. Urvan owed a fee would be deficient. But the actual language of Section 4.27 is "no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission."[227] In other words, the focus of this representation is on the entity to which a fee is owed, not who owes the fee. Also, the representation contemplates "arrangements made by *or on behalf of* [Gemini]."[228] Based on that language, Mr. Urvan owing a fee under arrangements made on Gemini's behalf would violate the representation. Seemingly, any arrangements Mr. Urvan made to sell Gemini

---

[225] *See inVentiv Health*, 2021 WL 252823, at *4-6; *Envolve Pharm.*, 2021 WL 855866, at *4 n.45.

[226] AMMO's Am. Compl. ¶ 73.

[227] MA § 4.27.

[228] *Id.* (emphasis added).

would have been made on Gemini's behalf.

As for whether Mr. Urvan actually owes Mr. Hayden a fee, it is at least reasonably conceivable. Mr. Hayden is currently litigating this very issue against Mr. Urvan in federal court.[229] At least some of Mr. Hayden's claims in that action are proceeding to trial.[230] Though Mr. Urvan disputes Mr. Hayden's claims, that isn't enough to shoulder Mr. Urvan's inconceivability burden.

About knowledge, Mr. Urvan suggests that even if Mr. Hayden's post-merger claim to a fee succeeds, Mr. Urvan inherently did not know about that payment obligation pre-merger. If actual knowledge of falsity was required for fraudulent inducement, Mr. Urvan's argument might persuade; but a reckless disregard for truth suffices.[231] As the individual who engaged with Mr. Hayden, Mr. Urvan would have had the facts necessary to determine whether Mr. Hayden was entitled to a fee. Accordingly, it is conceivable that Mr. Urvan either knew or should have known that Mr. Hayden would be owed a payment following the merger. Again, a motion to dismiss is not the setting to decide factual disputes.

Finally, Mr. Urvan alleges that AMMO failed to adequately[232] plead damages.

---

[229] AMMO's Am. Compl. ¶ 30.

[230] *Id.*

[231] *Abry Partners*, 891 A.2d at 1050.

[232] Urvan suggests some "lack of consensus within Delaware case law on whether fraud damages must be pled with 'particularity.'" Urvan's Reply Brief in Further Support of his Motion to Dismiss AMMO's Amended Complaint at 14 n.11 (D.I. 82). Chancery Court Rule 9(b) provides that "[i]n all averments of fraud or mistake, the *circumstances* constituting fraud or mistake shall

-52-

Not so.  In multiple places in its amended complaint, AMMO alleged that it "would not have closed the Merger on the terms it did had it known the truth."[233]  In its opposition brief, AMMO expounds that it could have pushed for a better deal had it known about Mr. Urvan's extensive efforts to sell Gemini and that it may have reconsidered working with an individual who had trouble maintaining business relationships.[234]  That is sufficient to state this claim.

### 2. The Arizona Securities Act Count is adequately pled.

In Count VI of AMMO's amended complaint, AMMO brings a claim under ASA § 44-1991(A)(2), which is the statutory equivalent of a fraudulent inducement claim.  As one would expect, Mr. Urvan first contends there were no misrepresentations in the Merger Agreement.  That argument is no more persuasive under this heading.  Mr. Urvan's only other argument is that Gemini was not a "security" within the meaning of the statute because it was wholly owned by AMMO.

AMMO doesn't contest that point.  Instead, AMMO says that the alleged

---

be stated with particularly." Ch. Ct. R. 9(b) (emphasis added).  Our Supreme Court's most recent explication on this tells us, "[t]he factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation." *Liborio III, L.P. v. Artesian Water Co., Inc.*, 2023 WL 6614194, at *10 (Del. Oct. 11, 2023) (citation omitted).  Notably, the elevated pleading standard is inapplicable to the averment of damages.

[233]  AMMO's Am. Compl. ¶¶ 8, 118.

[234]  AMMO's Opp'n Br. at 30 n.12.

misrepresentations in the Merger Agreement were made "in connection with a transaction . . . involving" the transfer of AMMO stock,[235] bringing the Merger Agreement within the ASA's reach.

AMMO's argument would be more easily accepted if it were contained in the amended complaint. Instead, AMMO's amended complaint only alleged that the Gemini membership interests were securities.[236] Fortunately for AMMO, Court of Chancery Rule 8 counsels forgiveness toward pleadings.[237] The facts of the merger detailed in AMMO's amended complaint give adequate notice that securities were involved. Moreover, Mr. Urvan can hardly claim he is prejudiced considering he is bringing nearly identical statutory claims based on the same transaction. So, the amended complaint's imprecision does not warrant dismissal of Count VI.

### 3. The Indemnification Claims:

#### a. The Triton Litigation Count is adequately pled.

AMMO seeks payment of its counsel fees from the Triton Litigation based on Section 9.5(a) of the Merger Agreement.

Mr. Urvan contests that obligation in two ways. First, he insists that only

---

[235] *See* ARIZ. REV. STAT. ANN. § 44-1991 (2021).

[236] *See* AMMO's Am. Compl. ¶ 121.

[237] Ch. Ct. R. 8(f) ("All pleadings shall be so construed as to do substantial justice."); *see also In re McDonald's Corp. Stockholder Deriv. Litig.*, 289 A.3d 343, 375-76 (Del. Ch. 2023) (explaining this Court's relatively indulgent pleading standards).

Section 9.5(f)—and not Section 9.5(a)—applies to the Triton Litigation. Second, he says that the relevant requirement that "in the reasonable opinion of counsel to the Indemnified Party . . . there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived" has not been met. Mr. Urvan's burden of demonstrating that AMMO's interpretation of the relevant provisions is unreasonable has not been met.

Mr. Urvan's suggestion that Section 9.5(f) unambiguously cancels out all of the provisions of Section 9.5(a) with regard to the Triton Litigation is unconvincing. Section 9.5(a)'s relevant language reads: "If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "Third-Party Claim") . . . ."[238] The provision then explains the applicable notice procedures.[239] Mr. Urvan posits that "receiv[ing] notice" is part of the definition of "Third-Party Claim," meaning Third-Party Claims must be initiated after the merger; but, even if that is itself a reasonable interpretation, it is certainly not the only one. It's also reasonable to interpret the language to mean "Third-Party Claim" is simply shorthand for the defined type of "Action"—*i.e.*, one brought by a non-party. Under that reading, the Triton Litigation

---

[238] MA § 9.5(a).

[239] *Id.*

would meet the definition of a Third-Party Claim.

Next, Mr. Urvan proposes that Sections 9.5(a) and 9.5(f) are in conflict. In his view then, only one or the other can apply to any single Action. Not so. Mr. Urvan incorrectly suggests that a more specific provision in a contract entirely displaces a general provision. But that's not the rule. Rather, "[u]nder the general/specific canon, '[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily *qualifies the meaning of* the general one.'"[240] So, the existence of Section 9.5(f) doesn't nullify Section 9.5(a) with regard to the Triton Litigation. Rather, the provisions should be read harmoniously and Section 9.5(f) might only trump Section 9.5(a) where there is true conflict.

Nothing in Section 9.5(f) precludes AMMO from being represented in the Triton Litigation. The only limitation was that AMMO could not "terminate any of the legal counsel currently handling the Triton Matter."[241] But AMMO didn't terminate Culhane Meadows; the firm withdrew. Accordingly, it is reasonable to interpret the Merger Agreement to allow AMMO to retain its own counsel for the Triton Litigation pursuant to the terms of Section 9.5(a).

The remaining question is whether a non-waivable conflict existed such that

---

[240] *Crispo v. Musk*, 2023 WL 7154477, at *5 (Del. Ch. Oct. 31, 2023) (alteration in original) (quoting *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005)).

[241] MA § 9.5(f).

Mr. Urvan's obligations to pay AMMO's counsel fees under Section 9.5(a) was triggered. AMMO raises at least a reasonable inference of that.

The relevant letter sent by Culhane Meadows discusses specific limitations on that firm's contemporaneous representation of both AMMO and Mr. Urvan based upon their incompletely aligned interests.[242] And, based on the contents of the letter, Culhane Meadows didn't give the parties the option to waive the conflict. Instead, it said "we believe the most prudent action is to withdraw as counsel for the AMMO Companies in the Cobb Action and permit them to be separately represented."[243] That raises a fair inference that "in the reasonable opinion of counsel to the Indemnified Party . . . there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived."[244] Accordingly, Count I of AMMO's amended complaint is adequately pled.

### b. The Tenor Litigation Count is adequately pled.

Count II of AMMO's amended complaint seeks fees related to an appeal bond in the Tenor Litigation. Mr. Urvan's counter lacks merit. Despite already having paid the principal amount that AMMO requested—months after the request and only once AMMO filed suit— Mr. Urvan wants to avoid paying associated interest and

---

[242] *See* Urvan's Mot., Ex. 4 at 1-2.

[243] Urvan's Mot., Ex. 4 at 2.

[244] MA § 9.5(a).

fees. His lone argument is that he received insufficient notice under Section 9.5(c).

As a preliminary matter, the Tenor Litigation pre-existed the merger and was expressly contemplated by the Merger Agreement's indemnification provisions.[245] Also, Section 9.5(c)'s notice requirements extend to the Direct Claim itself, not each individual Loss sustained because of the Direct Claim.[246]

In April 2023, AMMO contacted Mr. Urvan about the appeal bond premium and sent Mr. Urvan the invoice and the related letter of credit.[247] Mr. Urvan disclaimed responsibility for the payment.[248] After repeatedly seeking confirmation from Mr. Urvan that he would pay, AMMO eventually paid the bill itself on May 24, 2023.[249] Then, after AMMO filed its amended complaint, Mr. Urvan reimbursed the $38,750 premium in October 2023.[250]

In essence, Mr. Urvan argues that AMMO needed to provide separate notice of each cost it incurred related to the Tenor Litigation. But there's nothing in Section 9.5(c) that supports that view. To the contrary, the language that the notice "shall indicate the estimated amount, if reasonably practicable, of the Loss that has

---

[245] *Id.* §§ 1.38, 9.2(e).

[246] *Id.* § 9.5(c).

[247] AMMO's Am. Compl. ¶ 49.

[248] AMMO's Am. Compl. ¶ 50.

[249] *Id.* ¶¶ 52-53.

[250] Urvan's Mot., Ex. 6.

been *or may be* sustained by the Indemnified Party" suggests a one-time notice.[251] AMMO provided notice of the appeal bond costs in April 2023. Mr. Urvan didn't accept responsibility until October. So, even if the Indemnifying Party's thirty-day period to respond to the notice is a prerequisite to a lawsuit as Mr. Urvan contends, that period expired. Accordingly, Count II of AMMO's amended complaint survives Mr. Urvan's challenge.

### c. The Fee-Shifting Count is adequately pled.

Finally, there's the issue of whether AMMO's Count III claim for first-party fee-shifting can survive. It can. Mr. Urvan first says this count must go because he wasn't given adequate notice under Section 9.5(c).[252] Again, he fails.

The enforcement costs that AMMO seeks under this count are being incurred by this very litigation. Prior to this lawsuit commencing, there was nothing for AMMO to provide notice of. What's more, all of the relevant details required by Section 9.5(c)'s notice provision are within Mr. Urvan's knowledge as the counterparty.

Mr. Urvan's other argument is just as feeble. In his view, this indemnification claim is unripe and without the subject matter jurisdiction of this Court because AMMO's entitlement to fees is dependent on the outcome of this litigation. For this,

---

[251] MA § 9.5(a).

[252] Urvan's Mot. at 52.

Mr. Urvan relies primarily on a cramped read of *LaPoint v. AmerisourceBergen Corp.*[253] There, the Supreme Court held that indemnification claims "do not accrue until the underlying claim is finally decided" but did so in a very different context.[254]

In *LaPointe*, the plaintiff filed suit in the Court of Chancery for a breach of contract in 2004. The claim did not fully resolve until 2007.[255] Shortly after that resolution, the prevailing party sought contractual indemnification.[256] When the request was rejected, the indemnitee sued in Superior Court.[257] The Superior Court ruled that the indemnification claim should have been brought during the Chancery action and that the claim was outside the three-year statute of limitation because it accrued in 2004.[258] The Supreme Court held that waiting for the underlying litigation to resolve did not render the indemnification claim time-barred.[259] So, *LaPoint* only stands for the proposition that a party is allowed to bring a subsequent action for fee-shifting, not that it is disallowed from seeking fee-shifting in the initial action.

---

[253] 970 A.2d 185 (Del. 2009).

[254] *LaPoint*, 970 A.2d at 198.

[255] *Id.* at 189.

[256] *Id.*

[257] *LaPoint*, 970 A.2d at 189-90.

[258] *Id.* at 190-91.

[259] *Id.* at 197-98.

Mr. Urvan also cites *Batty v. UCAR International Inc*.[260]  There, this Court dismissed an indemnification claim without prejudice, finding it premature.[261]  But it appears from context that the *Batty* plaintiff was trying to obtain actual payment on her indemnification claim before the case resolved.[262]

Here, AMMO acknowledges it must await the end of this litigation to recover on this Count.[263]  And, since *Batty*, this Court has regularly maintained fee-shifting claims in the same action upon which they are dependent.[264]  There's no reason to depart from that approach here.[265]

At bottom, the uncertainty concerns that undergird ripeness are weak when the chief uncertainty is the resolution of the current litigation.[266]  Compared to the obvious risk of wasteful litigation if AMMO is forced to file a separate action to pursue its fees, it is better to keep Count III alive.

---

[260]  2019 WL 1489082 (Del. Ch. Apr. 3, 2019).

[261]  *Batty*, 2019 WL 1489082, at *9.

[262]  *See id.* ("Batty argues that the phrase 'in seeking' in Section 9 creates a right to advancement.").

[263]  AMMO's Opp'n Br. at 52.

[264]  *See LPPAS Representative v. ATH Hldg.*, 2022 WL 94610, at *1 (Del. Ch. Jan. 10, 2022); *AB Stable VIII v. Maps Hotels & Resorts One*, 2020 WL 7024929, at *100 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021); *Manti Hldgs. v. Authentix Acq.*, 2020 WL 4596838, at *9 (Del. Ch. Aug. 11, 2020), *aff'd*, 261 A.3d 1199 (Del. 2021).

[265]  Urvan's postulation that the defendants in those post-*Batty* cases may not have raised ripeness ignores the fact that the Court will raise a lack of subject matter jurisdiction *sua sponte*.

[266]  *See, e.g.*, *Benefytt Techs., Inc. v. Capitol Specialty Ins. Corp.*, 2022 WL 16504, at *9 (Del. Super. Ct. Jan. 3, 2022).

## V. CONCLUSION

For the reasons stated above, the AMMO Entities' Motion to Dismiss is **GRANTED in part, DENIED in part**, and Mr. Urvan's Motion to Dismiss is **DENIED.**

**IT IS SO ORDERED.**

*/s/ Paul R. Wallace*
Paul R. Wallace, J.